1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10   RRW LEGACY MANAGEMENT GROUP,          CASE NO. C14-326 MJP
     INC., et al.,

11                                         ORDER ON MOTIONS FOR
                          Plaintiffs,      SUMMARY JUDGMENT

12

13           v.

     CAMPBELL WALKER,
14
                          Defendant.
15

     _____
16

     CAMPBELL INVESTMENT COMPANY,           (CONSOLIDATED WITH C14-1544
17                                          MJP)
                          Plaintiff,
18

19           v.

     CAMPBELL WALKER,
20
                          Defendant.
21

22

23

24

ORDER ON MOTIONS FOR SUMM JMT - 1

1   The Court, having received and reviewed:

2       1.   Plaintiffs' Motion for Summary Judgment (Dkt. No. 92), Campbell M. Walker's

3            Opposition to Motion for Summary Judgment (Dkt. No. 103), and Plaintiffs' Reply to

4            Motion for Summary Judgment (Dkt. No. 111);

5       2.   Plaintiff Campbell Investment Company, Inc.'s Motion for Partial Summary

6            Judgment (Dkt. No. 96); Defendant Campbell M. Walker's Opposition to Campbell

7            Investment Company, Inc.'s Motion for Summary Judgment (Corrected)(Dkt. No.

8            108); and Plaintiff Campbell Investment Company, Inc.'s Reply in Support of Motion

9            for Partial Summary Judgment and Motion to Strike (Dkt. No. 114);

10      3.   Defendant Campbell M. Walker's Motion for Summary Judgment (Dkt. No. 98);

11           Plaintiffs RRW and Antoinette Walker's Opposition to Defendant's Motion for

12           Summary Judgment (Dkt. No. 100); and Defendant's Reply in Support of Motion for

13           Summary Judgment (Dkt. No. 109);[1]

14  and all attached declarations and exhibits, makes the following rulings:

15      IT IS ORDERED that summary judgment on Plaintiff RRW Legacy Management Group,

16  Inc.'s request for declaratory judgment is GRANTED.

17      IT IS FURTHER ORDERED that summary judgment on Plaintiff RRW Legacy

18  Management Group, Inc.'s motion to dismiss Defendant's counterclaims is GRANTED.

19      IT IS FURTHER ORDERED that summary judgment on Plaintiff Campbell Investment

20  Company's claim for breach of fiduciary duty is GRANTED.

21

22

---

23  [1] Prior to the scheduled oral argument on these motions, the Court was informed that the individual claims of
    Plaintiff Antoinette Walker had been resolved, thus mooting portions of Plaintiffs' Motion for Summary Judgment
24  (Dkt. No. 92) and Defendant's Motion for Summary Judgment (Dkt. No. 98).  This order will address only the
    issues remaining following resolution of Plaintiff Walker's individual claims.

ORDER ON MOTIONS FOR SUMM JMT - 2

1    IT IS FURTHER ORDERED that Plaintiff Campbell Investment Company's motion to

2  strike is GRANTED.

3    IT IS FURTHER ORDERED that summary judgment on Defendant Campbell M.

4  Walker's claim of defense under laches is DENIED.

5  **Background**

6  **A.  Argyll Limited Partnership and CIC**

7    The patriarch of the Walker family, Robert R. Walker ("Robert"), formed Argyll Limited

8  Partnership ("Argyll") in 1992; Argyll is governed by a limited partnership agreement ("the

9  Agreement") subject to Washington law.  (Dkt. No. 11-1 at 5, 22; Dkt. No. 11 at 2.)  Under the

10  Agreement, Robert became the General Partner, and he and his five children – Defendant

11  Campbell Walker ("Campbell"), Victoria Walker Councell ("Victoria"), Cody C. Walker

12  ("Cody"), Plaintiff Antoinette R. Walker ("Antoinette"), and Robert Angus Walker ("Angus") –

13  became limited partners.  (Dkt. No. 11-1 at 5; Dkt. No. 11 at 2.)   Under the Agreement, Robert

14  had a 5% interest as General Partner and a 20% interest as a limited partner.  (Dkt. No. 11-1 at

15  7.)  The children each had 15% interests as limited partners.  (Id.)

16    The General Partner had "exclusive power and authority to manage" Argyll's business

17  and affairs.  (Id. at 13.)  Limited partners cannot vote on any matter except for "removal and

18  selection of a successor" to the General Partner (and to require substance testing).  (Dkt. No. 11-

19  1 at 14.)  As stated in the Agreement, the limited partners can remove the General Partner "for

20  cause," which includes acts of fraud, larceny, willful misconduct, deceit or a "crime otherwise

21  involving moral turpitude, willful misrepresentation to Partners, or the continued and habitual

22  misuse of alcohol or any use of controlled substances."  (Id. at 15.)  An "affirmative vote of

23  Limited Partners having a majority of the Limited Partners' Partnership Interests" is necessary to

24  remove the General Partner for cause.  (Id. at 14.)

ORDER ON MOTIONS FOR SUMM JMT - 3

1    Once the General Partner is removed, the mechanism by which the successor General

2  Partner is selected is in dispute (this dispute comprises the second part of Plaintiff RRW Legacy

3  Management Group's (RRW's) declaratory judgment request).  There are two sections in the

4  Agreement which concern the selection of a new General Partner.  § 6.1 states

> **6.1 Voting.** A Limited Partner shall not be entitled to a vote on any matter
> whatsoever except only for (a) removal and selection of a successor to, and
> requesting testing of, the General Partner or Successor General Partner as
> provided in Section 7 of this Agreement, (b) removal or appointment of an
> Agent as provided in Section 9.3, and (c) appointment of a Liquidator as provided
> in Section 11(b) of this Agreement. In these instances, each Limited Partner's
> voting interest shall be equal to his or her Partnership Interest and the affirmative
> vote of Limited Partners having a majority of the Limited Partners'
> Partnership Interests shall constitute approval of the action being considered.

10    But there is another section which is also concerned with the replacement of a General

11  Partner.  § 7.6 states

> **7.6 Termination**. If both the General Partner and any and all Successor General
> Partners are removed, withdraw, resign or otherwise become unable or unwilling
> to act or continue to act as General Partner of the Partnership, the Partnership
> shall be terminated unless a new General Partner is selected within sixty (60) days
> of the date on which the Partnership no longer had a General Partner. The Limited
> Partners first shall be given a period of thirty (30) days in which to select a new
> General Partner. Selection shall occur upon agreement of Limited Partners
> holding 60% or more of the Limited Partners' Partnership Interests.

There is considerable disagreement as to which of these provisions applied to the selection of

Defendant's replacement as General Partner (see "RRW Declaratory Judgment" section *infra*).

Once selected, the new General Partner "shall, unless already acquired by him or her, purchase

the Partnership Interest of the General Partner[.]"  (Id. at 16.)

    Argyll was created to manage Robert's share in Campbell Investment Company, Inc.

(CIC) (RRW Ex. A, ¶ 3.1), a closely-held family corporation which functioned as an investment

vehicle for the Walker family.  Defendant was the president and a director of CIC from 1999-

2014. Argyll is the largest shareholder in CIC (Dkt. No. 11, ¶ 5) and thus the Argyll General

Partner controls the management of CIC.  The remaining siblings were minority shareholders of CIC during the period in question.

**B.  Events After Campbell Succeeded Robert R. Walker as General Partner**

In 1999, Robert appointed Campbell to succeed him as General Partner and assigned him his 5% interest as General Partner.  (Dkt. No. 11 at 2.)  Robert's 20% interest as limited partner was distributed equally among Campbell and the other four children.  (<u>Id.</u>)  Each of Robert's children then had a 19% interest as a limited partner, and Campbell had an additional 5% interest as General Partner, bringing his total to 24%.  (<u>Id.</u>)

During his tenure as General Partner of Argyll and President of CIC, Defendant was paid a salary and bonuses by both companies, plus pension contributions and director's fees from CIC.  (RRW Ex. M at Attachment 2, p. 11.)  Defendant also authorized the payment of several million dollars in management fees to an entity owned and operated by Robert known as the Darshan League, Ltd. ("Darshan"), an off-shore company which was later (following Robert's death) owned by Defendant.  (RRW Ex. D at 154:7-25, 169:14-170:9.)   The fees were determined based on consultations with two friends and business associates and the agreement of Robert, and no one had the authority to veto or override that determination.  (<u>Id.</u>, 52:17-53:5, 172:16-173:21.)  Defendant also took over $1 million in loans from Darshan, loans which have not been repaid to this date.  (<u>Id.</u>, 171:9-18, 206:16-18.)

In February 26, 2014, Antoinette, Victoria, and Angus voted to remove Campbell as General Partner.  (Dkt. No. 11-2 at 2.)  Following Campbell's removal, the same three siblings who removed him voted to appoint RRW as the successor General Partner.  (Dkt. No. 11 at 3; Dkt. No. 11-3 at 2.)  Antoinette is the president and sole shareholder of RRW.  (Dkt. No. 15 at 7.)  Although RRW was appointed as successor General Partner, there has as yet been no transfer of the 5% General Partner interest from Campbell to RRW.

ORDER ON MOTIONS FOR SUMM JMT - 5

1    RRW and Antoinette filed the first suit against Campbell (in February 2014), seeking a

2    declaratory judgment that (1) Defendant had been properly removed as General Partner and (2)

3    RRW had been properly installed as his successor (C14-326, Dkt. No. 2); that complaint was

4    amended in a later pleading to add Antoinette's personal causes of action against Defendant.

5    (Dkt. No. 72.)[2]  Defendant filed a third-party complaint asserting counterclaims for tortious

6    interference, civil conspiracy and violation of Washington limited partnership law. (Id., Dkt. No.

7    12.)  Later (in October 2014), CIC filed suit against Campbell, seeking damages for breach of

8    fiduciary duty. (C14-1544, Dkt. No. 1.)  The Court consolidated both cases earlier this year. (Id.,

9    Dkt. No. 85.)

10   **Discussion**

11   **I.      RRW's Motion for Summary Judgment**[3]

12

13           **A.      *RRW Declaratory Judgment***

14   Plaintiffs seek declaratory judgment on two issues:

15           **1.**   *That Defendant was properly removed for cause*.

16                   **7.1 Removal of General Partner**. Subject to the provisions set forth in this
                     Section 7.1, the Limited Partners shall have the right to remove the General
17                   Partner for cause. As used in this Section 7.1, the term "cause" shall mean acts of
                     the General Partner or any individual controlling the General Partner which
18                   constitute larceny, fraud, deceit, willful misconduct or a crime otherwise
                     involving moral turpitude, willful misrepresentation to Partners, or the continued
19                   and habitual misuse of alcohol or any use of controlled substances.

20   Plaintiffs claim that Defendant committed "multiple acts of deceit, willful misrepresentation and

21   willful misconduct" (Dkt. No. 92 at 16) – that he misrepresented to them their rights as limited

22   _____

23   [2] As discussed *supra*, Antoinette's personal causes of action have been resolved and are no longer a part of this lawsuit.
     [3] Defendant asserts that all the claims in all of the Plaintiffs' summary judgment motions are barred by laches, an

24   argument which is fully discussed in the section on CIC's summary judgment motion *infra*.

1  partners, refused to provide financial information about the company, and engaged in a pattern of

2  self-dealing to his benefit and the company's detriment – and that those acts form the "cause" for

3  his removal.

4     Many of the allegations against Defendant fall into the realm of "disputed issues of

5  material fact" (essentially, "he said/she said" charges and countercharges concerning threats,

6  misrepresentations, etc.).  But three of them stand out as undisputed material facts that constitute

7  adequate grounds for removal and entitle Plaintiffs to summary on this portion of their

8  declaratory relief:

9  a.    Refusal to provide financial information:  The Washington Limited Partnership Act (WLPA)

10        provides the right of limited partners to "inspect and copy required information" concerning

11        the partnership without "any particular purpose" for seeking the information.  RCW

12        25.10.331(1).  All the limited partners allege that they sought information regarding the

13        company from Defendant at one time or other; in many instances, Defendant denies that they

14        did so or says they were not "formal, proper" requests for information.  (Neither the

15        Agreement nor Washington statute requires that requests for financial information be in any

16        particular form or format.)  However, Defendant does concede that, on at least two occasions,

17        he received requests for financial information regarding the company and (on instructions

18        from Robert) declined to turn any information over.  (RRW Ex. D (Campbell Depo) at

19        126:24—127:19 [request from Antoinette]; 129:20—130:10 [requests from Victoria and

20        Cody].)  Defendant's undisputed refusal to provide such information on request is a clear

21        violation of the WLPA and an act of willful misconduct.

22  b.  Failure to keep company records in Washington: It is undisputed that, at some point

23        following his appointment as General Partner of Argyll, Defendant began maintaining the

24

ORDER ON MOTIONS FOR SUMM JMT - 7

1   records of Argyll and CIC in Roswell, New Mexico.  (RRW Ex. D, 41:11-42:10, 51:16,

2   125:5-9.)  The Agreement required that the records be maintained at the office of the

3   Partnership (which was at the time of execution located at 300 Harbor Building in Edmonds,

4   Washington) "or such other place or places in the State of Washington as the General Partner

5   from time to time designates by notice to the Limited Partners."  (RRW Ex. A, ¶¶ 1.4, 10.1.)

6   Defendant admitted at his deposition that he was aware of the requirement to maintain the

7   records within the State of Washington.  (RRW Ex. D, 22:8-16, 124:13-125:4.)  Defendant's

8   removal of the company records to an attorney/friend's office in New Mexico is a clear

9   violation of the Agreement and an act of willful misconduct.

10      Defendant argues that the 300 Harbor Building was the office of Robert's attorney who

11   left the company in 2000 and it would have been pointless to keep the records there once the

12   attorney had departed, but the Agreement is clear that the records are to remain in "such

13   other place or places in the State of Washington as the General Partner from time to time

14   designates by notice to the Limited Partners."  (emphasis supplied.)

15      Defendant characterizes this issue as "silly."  (Dkt. No. 103 at 17.)  The Court could not

16   agree less.  The requirement that the records of a partnership be maintained in a location

17   where the limited partners have easy access for review is a cornerstone of limited partnership

18   law in Washington.  In this case, it goes to the heart of the contention that Defendant had an

19   ongoing practice of denying his siblings/limited partners access to the financial records of the

20   partnership.   The removal of the records from the State of Washington was an act of willful

21   misconduct on Defendant's part and grounds from removal under the Agreement.

22   c.  Financial dealings between CIC and the Darshan League: These allegations (and Defendant's

23   response thereto) are discussed in depth in the section concerning Plaintiff CIC's summary

24

judgment motion, so the Court will simply note here its conclusion that the financial

arrangements created by Defendant (without input or approval from anyone else associated

with Argyll or CIC) involving the Darshan League constituted breaches of his fiduciary duty

– an act of willful misconduct which (alone) satisfied the "cause" requirement for his

removal.

The Court notes that Defendant interposed at oral argument the defense that his actions do

not qualify as "willful conduct," citing the legal definition of that term which appears in

Adkisson v. Seattle, 42 Wn.2d 676 (1953):

> To constitute willful misconduct, there must be actual knowledge, or that which the law deems to be the equivalent of actual knowledge, of the peril to be apprehended, coupled with a conscious failure to avert injury.

Id. at 684 (quoting 38 Am.Jur. 693, Negligence, § 48).  It is apparently Defendant's contention

that his subjective good faith belief that he was acting in the best interests of the partnership and

of his family (with a corresponding absence of intent to actively do harm) shields his behavior

from qualifying as "willful misconduct."

The Court is guided by the definition of "willful misconduct" as it appears in the

Washington Pattern Civil Jury Instructions:

> Willful misconduct is the intentional doing of an act which one has a duty to refrain from doing or the intentional failure to do an act which one has the duty to do when he or she has actual knowledge of the peril that will be created and intentionally fails to avert injury.

WPI 14.01, 6 Wash. Prac., Wash. Pattern Jury Instr. Civ. (6th ed.). The Court finds, under this

definition, that Defendant's actions qualify as "willful misconduct" sufficient to satisfy

Washington law and the requirements of the Agreement.  There is no question that Defendant

behaved intentionally in refusing to provide financial information upon request, moving the

partnership records out of the State of Washington and choosing to pay millions of dollars to

ORDER ON MOTIONS FOR SUMM JMT - 9

Darshan.  As this order reflects, there is also no question in the Court's mind that Defendant both did things it was his duty to refrain from doing and failed to do things which duty dictated that he do.  The "actual knowledge of the peril" and failure to avert injury elements are satisfied by Defendant's knowledge that he owed fiduciary duties to both Argyll and CIC (RRW Ex. D. at 103:10-13, 105:21-106:8) and that the law required that Argyll's books and records be maintained in the State of Washington.  (Id. at 22:8-16, 124:13-125:4.)  In the case of the latter, Defendant even wrote a margin note on an email outlining his legal duties which queried "What is the downside or fine or penalty if the conditions are not met?"  (RRW Ex. L.)

Let the record be clear: by his intentional acts, Defendant violated several statutes governing the conduct of limited partnerships and corporate governance.  It cannot be – and it is not – a defense in such circumstances that the malfeasant had some subjective belief that his/her conduct was ultimately in the best interests of the business entity.

The Court finds that Defendant was aware of his duties and obligations under the law and under the Agreement and that his failure, through his intentional acts, to abide by those duties and obligations qualifies as "willful misconduct."  The Court further finds that cause existed for Defendant's removal under the Agreement, that Defendant was properly removed under the terms of the Agreement, and that Plaintiffs are entitled to summary judgment on the first portion of their declaratory judgment claim.

    2.   *That RRW was properly appointed as Successor General Partner*

The Court finds that the Agreement is not well-drafted as concerns the issue of appointing a successor General Partner once the existing one is removed.  § 6.1 states that the Limited Partners have voting rights only in limited circumstances, one of which is the "removal

1   and selection of a successor to… the General Partner or Successor General Partner *as provided*

2   *in Section 7 of this Agreement.*"  (emphasis supplied.)  It then goes on to say that

3           [i]n these instances [where the Limited Partners have voting rights] each Limited
            Partner's voting interest shall be equal to his or her Partnership Interest and *the*

4           *affirmative vote of Limited Partners having a <u>majority</u> of the Limited Partners'*
            Partnership Interest shall constitute approval of the action being considered.

5

6   (emphasis supplied.)   Under § 6.1, General Partners can be removed and appointed by majority

    vote of the Limited Partners.

7

8           However, a review of § 7 reveals the following provision:

9           **7.6 Termination**. If both the General Partner and any and all Successor General
            Partners are removed, withdraw, resign or otherwise become unable or unwilling
            to act or continue to act as General Partner of the Partnership, the Partnership

10          shall be terminated unless a new General Partner is selected within sixty
            (60) days of the date on which the Partnership no longer had a General Partner.

11          The Limited Partners first shall be given a period of thirty (30) days in which to
            select a new General Partner. *Selection shall occur upon agreement of Limited*

12          *Partners holding <u>60% or more</u> of the Limited Partners' Partnership Interests.*

13  (emphasis supplied.)  Depending on whether Defendant's 5% General Partner interest is included

14  in the calculation, the three siblings/Limited Partners who selected RRW as the Successor

15  General Partner either did or did not have the 60% "of the Limited Partners' Partnership

16  Interests."

17          The ousting siblings further complicated matters by initially claiming authority under

18  § 7.6 in the document they transmitted to Defendant announcing the appointment of RRW as the

19  Successor General Partner (RRW Ex. Q).  Plaintiffs have now reconsidered their position and

20  argue that § 6.1 is the controlling provision and that the three siblings/Limited Partners who

21  voted out Defendant and voted in RRW had more than a majority of the Limited Partnership

22  interests and therefore were fully authorized to do what they did.

23

24

    ORDER ON MOTIONS FOR SUMM JMT - 11

1    The Court is convinced that § 6.1 is the provision which controls this process.  § 7.6 is

2    intended as a "wrap-up provision" to govern the situation where the affairs of the partnership are

3    on the verge of termination; that provision (and its "60%" requirement) is clearly conditioned on

4    the following condition precedent:

5              If both the General Partner *and any and all Successor General Partners are*
                *removed, withdraw, resign or otherwise become unable or unwilling to act or*
6              *continue to act* as General Partner of the Partnership…

7    (emphasis supplied.)  Under the facts before this Court, those conditions simply did not exist --

8    Defendant had been properly removed, a Successor General Partner had been appointed and was

9    able and willing to act -- thus the 60% requirement of § 7.6 was inapplicable.  The voting

10   procedure outlined in § 6.1 was in effect and a majority vote was sufficient to install a successor.

11   Plaintiffs are entitled to summary judgment on the second portion of their declaratory

12   judgment claim as well.

13   3.  *Defendant's counterclaims*

14   Defendant asserted a number of counterclaims against Plaintiffs in this portion of the lawsuit.

15   Plaintiffs moved for summary judgment on all of them, and Defendant responded only cursorily

16   to those arguments.  The Court finds Plaintiffs' position regarding the counterclaims to be well-

17   taken as analyzed below:

18              a.  **Civil conspiracy**:  This cause of action requires two or more people combining to

19                  accomplish an unlawful purpose and an agreement to accomplish that unlawful

20                  object.  Wilson v. State, 84 Wn.App. 332 (1996).  Having found that the siblings had

21                  a right to remove Defendant and did so properly, there is no "unlawful purpose" and

22                  this counterclaim fails.

23

24

b. **Tortious interference**: Defendant asserts that Plaintiffs' actions interfered with "contractual relationships and business expectancies" he enjoyed as the General Partner of Argyll.  Washington law is clear that a party "who in good faith asserts a legally protected interest of his own which he believes may be impaired by the performance of a proposed transaction is not guilty of tortious interference."  Brown v. Safeway Stores, Inc., 94 Wn.2d 359, 375 (1980).  Again, summary judgment in Plaintiffs' favor on the declaratory judgment request operates to foreclose Defendant from this claim.

c. **Breach of duty of good faith and fair dealing**:  Defendant cites his removal "without cause," the failure to advise him of the cause for his removal or provide such information upon request as violations of the duty of good faith and fair dealing.  The Court has already found that Defendant was removed for cause, and that portion of his claim can be excised.  Defendant cites to no requirement in the Agreement that the General Partner be provided with notice of the nature of the cause for his removal, therefore that portion of this claim fails as well.

d. **Violation of Washington partnership statutes**: Defendant alleges that his formal demand for information regarding the nature of the cause for his removal constituted a lawful demand for access to partnership information pursuant to RCW 25.10.331(2) and RCW 25.10.431(3) to which Plaintiffs failed to respond.  (Dkt. No. 74, ¶¶ 25-29.)  First of all, Plaintiffs maintain that they did offer to make the limited partnership's records available for Defendant's inspection (*see* RRW Mtn, Ex. S), but that Defendant never showed up for the inspection.  (Declaration of Antoinette Walker, ¶ 4.)  More to the point, the statute to which Defendant refers provides that limited

partners may "inspect and copy true and full information regarding the state of the activities and financial condition of the limited partnership and other information regarding the activities of the limited partnership as is just and reasonable."  RCW 25.10.331(2).  Plaintiffs argue (and Defendant does not contest) that the information he requested does not fall within the ambit of the statute (nor, again, does the Agreement require that the General Partner be provided with notice of the grounds for removal).  The Court agrees.

The Court grants summary judgment to Plaintiffs as regards Defendant's counterclaims; those claims will be dismissed.

**II.    CIC Motion for Summary Judgment**

This Plaintiff has a single cause of action -- breach of fiduciary duty – on which it seeks summary judgment .  Defendant interposes a laches defense (discussed at the end of this section).

Under RCW 23B.08.320, a breach of fiduciary duty occurs whenever a director engages in:

1.  Intentional misconduct,
2.  A knowing violation of the law,
3.  A violation of RCW 23B.08.310, or
4.  Any transaction with benefits to which the director is not entitled

The common law duties of loyalty, care and acting in good faith (Grassmueck v. Barnett, 281 F.Supp.2d 1227, 1232 (W.D. Wash. 2003)) are heightened in a closely-held corporation such as CIC.  Saviano v. Westport Amusements, Inc., 144 Wn.App. 72, 80 (2008).  The duties of care owed by directors and officers include requirements to:

1. Conduct themselves with the care of an ordinarily prudent person in a like position under similar circumstances;
2. Assess available information and perform their actions carefully, thoughtfully and in an informed manner;
3. Seek all relevant material information before acting; and
4. Avoid and prevent corporate waste and unnecessary expense.

Grassmueck, 281 F.Supp.2d at 1230 (citing RCW 23B.08.300—400).  Washington law is clear that directors and officers are not permitted any personal profit or advantage stemming from the exercise of their roles in the corporation.  Leppaluoto v. Eggleston, 57 Wn.2d 393, 402 (1960).

To that end, Washington law regulates "conflicting interest" transactions, defined as transactions in which

> … the director knows at the time of the commitment that the director or a related person is a party to the transaction or has a beneficial financial interest in or so closely linked to the transaction and of such financial significance to the director or a related person that the interest would reasonably be expected to exert an influence on the director's judgment if the director were called upon to vote on the transaction.

RCW 23B.08.700(1).  In order to avoid the impropriety of a conflicting interest transaction, a director contemplating such a commitment is required to obtain approval from a majority, but no fewer than two, of the qualified directors of the company who do not have a conflicting interest in the transaction.  RCW 23B.08.720.

The most problematic aspect of Defendant's financial dealings as the person with primary fiduciary responsibility for CIC was the payment, over the course of many years, of management fees to the Darshan League.  Darshan was created by Robert and owned by him until his death. (CIC Mtn, Ex. A, Defendant Depo at 170:13-19.)  According to Defendant, Darshan was paid management fees (totaling millions of dollars) for "helpful management and advice… providing dad's advice and my advice and helping with, you know, the ongoing discussions of what go [sic] on in running a company…" (Id. at 154:12-18.)  Although Defendant himself received no salary from Darshan, he did receive approximately $1 million in loans from Darshan (Id. at

1   171:7-18) which have never been repaid. (Id. at 206:16-18). Upon Robert's death, Defendant

2   became the owner of Darshan. (Id. at 171:23-24.) At that point, the Court presumes that any

3   payments to Darshan became payments to Defendant.

4          This is a textbook example of a "conflicting interest transaction." Even before Defendant

5   assumed ownership of Darshan, (1) CIC's payment of management fees to the company was a

6   direct financial benefit to his father, who unquestionably qualifies as a "related person" under the

7   language of the statute and (2) Defendant was the recipient of approximately $1 million in

8   (unpaid) loans from the company. (Id. at 206:16-18.) Once Defendant assumed ownership of

9   Darshan upon his father's death (2013), the conflict is further compounded – he now owned a

10  company which he was unilaterally deciding would be receiving management fees from another

11  company of which he was an officer and director. In a crowning act of self-dealing, on the day

12  of his removal as General Partner at Argyll he directed the CIC bookkeeper to pay Darshan

13  $50,000 in "consultancy management fees." (Id. at 209:24—210:15.)

14         Defendant attempts to deflect this issue with his own variation of the "Dad made me do

15  it" defense. He goes to great lengths to chronicle how Robert retained (seemingly absolute)

16  control over the affairs of Argyll and CIC even after he stepped down as General Partner and

17  appointed Defendant. He describes his father as "strong-willed" and "controlling" and cites the

18  power that Robert retained to remove Defendant as General Partner at any time. His brief even

19  names Robert the "Uber-General Partner" of Argyll. (Def Response, Dkt. No. 108-1 at 4-5.) As

20  personally unfortunate as this all might be, it is useless as a legal defense. Defendant had

21  complete and actual legal responsibility for CIC – the fact that he abdicated that responsibility to

22  his father does not operate to shield him from the operation of the "conflicted interest" statute,

23  from his responsibility as a fiduciary of the company and (ultimately) from liability.

24

1      In fact, his "defense" that he lived in seemingly daily fear of losing his job acts as further

2   evidence of the conflicted nature of the CIC-Darshan arrangement – because of their fiduciary

3   responsibility to the corporation, "directors and officers cannot directly or indirectly acquire a

4   profit for themselves or *acquire any other personal advantage* in dealings with others on behalf

5   of the corporation." State ex rel. Hayes Oyster Co. v. Keypoint Oyster Co., 64 Wn.2d 375, 381

6   (1964)(emphasis supplied).  Defendant's constant acquiescing to his father's wishes/demands in

7   order to retain his position was nothing other than the acquisition of a personal advantage.

8      By statutory operation, all these conflicted interest transactions triggered the requirement

9   that Defendant obtain approval from a majority, but no fewer than two, of the qualified directors

10  of the company who did not have a conflicting interest in the transaction.  RCW 23B.08.720.  It

11  is wholly undisputed that Defendant did not do this.  (CIC Mtn, Ex. A, Def Depo at 113:5-7.)

12     Plaintiff CIC has a litany of other conduct which it alleges constituted breaches of

13  Defendant's fiduciary duty to the corporation – his failure to obtain approval from the directors

14  for any business decision, his failure to hold a single formal board of directors or shareholders

15  meeting during his tenure, his partnering of CIC with other smaller companies (in some of which

16  he had an interest) for investment applications, his excessive global travel expenses – but they

17  are all subject to either a laches defense (*see infra*) or exculpatory explanations of Defendant

18  which transform them to disputed issues of material fact.

19     In any event, the Court does not find that anything beyond the conflicted interest

20  transactions described above is required to award summary judgment to CIC on their breach of

21  fiduciary duty claim.  The facts are undisputed and the law is clear.  Defendant's conduct in this

22  regard violates at least two of the four elements of the statutory duty laid out in RCW

23  23B.08.320: it is intentional misconduct, and it generated benefits to which Defendant was not

24

legally entitled at the expense of the corporation.  Only one element is required to establish a violation.  On the undisputed facts before the Court, Plaintiff CIC is entitled to summary judgment as a matter of law on its breach of fiduciary duty claim.

### A.    *Defenses*

Similar to his argument that his behavior did not constitute "willful misconduct," Defendant interposes defenses/explanations of "good faith" to defeat summary judgment against CIC, claiming that he believed his actions were in the best interests of the company and that the fees which he committed CIC to pay to Darshan inured to the company's benefit in terms of their father's wisdom, expertise and guidance.  (Dkt. No. 108, Def. Response at 17-22.)  At the very least, he argues, his subjective beliefs and motivations raise disputed issues of material fact which are not amenable to resolution by summary judgment.  This is not a persuasive argument.

In the first place, Defendant cites no authority that a good faith belief that he was acting in the company's best interests transforms a conflicted interest transaction into a legally-sanctioned one or exempts him from the operation of RCW 23B.08.700(1) or RCW 23B.08.720.  In the second place, RCW 23B.08.320 dictates a finding of breach of fiduciary duty whenever a defendant is involved in "[a]ny transaction with benefits to which the director is not entitled."  No exception is made for transactions which are allegedly motivated by a good faith belief that the actions were somehow legitimate or benign.

Finally, Defendant asserts that the causes of actions of all the Plaintiffs are defeated by the equitable doctrine of laches, the elements of which are (1) an unreasonable delay in filing a suit (2) by operation of which a defendant is prejudiced.  Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 835 (9th C. 2002).  He points out that, if the statute of limitations on a particular cause of action has run, laches is presumed.  Id. at 835-36.

1    As Defendant raises this defense in regards to the claims of all Plaintiffs, the Court's

2    analysis will encompass all claims at issue in this consolidated lawsuit.  Defendant is correct that

3    alleged misconduct such as the refusal to provide financial information or hold meetings was

4    known to (and complained about by) the siblings for many years.  In terms of the first-filed,

5    RRW-Antoinette Walker portion of the suit, this argument is only applicable to Antoinette's

6    personal claims, which have been resolved and are no longer at issue.  The declaratory judgment

7    action on behalf of RRW concerns events which occurred in 2014 and there is clearly no issue as

8    to laches regarding the propriety of the removal of Defendant and appointment of RRW as his

9    successor – RRW filed suit within weeks of Defendant's removal.

10    Concerning the CIC fiduciary duty claim, the defense fails.  First of all, the statute of

11    limitations for a fiduciary duty breach is three years.  (RCW 4.16.080.)  CIC filed its complaint

12    in October 2014, so the effective date of any alleged violations runs back to October 2011:

13    within that period of time, Robert was still alive, Darshan was being paid its consultancy fees,

14    and Defendant took over Darshan and began essentially paying himself (including his final act of

15    writing himself a $50,000 check on his way out the door).  There are more than sufficient

16    grounds for a breach of fiduciary duty claim in that time frame, so no presumption of

17    unreasonable delay or prejudice accrues to Defendant.

18    Defendant presents no proof that CIC was aware of the payments to Darshan prior to

19    their October 2014 filing, so he has no evidence to support an "unreasonable delay" argument.

20    His "prejudice" argument is composed of a single fact: Robert is dead.  This argument is

21    premised on the assumption his father's testimony (presumably about Robert calling the shots for

22    Argyll and CIC and directing/"forcing" his son to do all the things he is now being sued for)

23    would somehow be exculpatory, but in actuality Robert's testimony is irrelevant to the issues in

24

1  this lawsuit.  Nothing Robert could testify to would change the nature of Defendant's duties nor

2  the fact that at the end of the day he was legally responsible for the decisions he made in his

3  capacity of officer and director of CIC.  The absence of Robert does not operate to Defendant's

4  legal prejudice here.

5  　　　　Finally, as regards Defendant's invocation of the equitable defense of laches, it is

6  hornbook law that one who seeks equity must have clean hands.  Cornish College of the Arts v.

7  1000 Virginia Ltd. Partnership, 158 Wn.App. 203, 216 (2010); Precision Instrument Mfg. Co. v.

8  Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945).  Based on the findings that Defendant

9  breached his duty of fiduciary duty, violated Washington limited partnership statutes and

10  engaged in multiple conflicted interest transactions, it almost goes without saying that he does

11  not come before the Court with clean hands.

12  　　　　The Court finds, on the undisputed facts presented, that Plaintiff CIC is entitled as a

13  matter of law to a summary judgment finding in its favor on the claim of breach of fiduciary duty

14  by Defendant.

15  **B.    CIC's Motion to Strike**

16  　　　　In its reply brief, CIC moves to strike a number of statements which Defendant submitted

17  as evidence on the grounds that they are hearsay or otherwise unsupported by proper foundation.

18  (Dkt. No. 114 at 11-12.)  The Court agrees – the statements (contained in the Declarations of

19  Victoria Walker, Stephen Gray, Patricia Greenwade, and Scott McClelland) are all inadmissible

20  hearsay and opinion testimony.  The Court grants the motion to strike the statements identified in

21  CIC's reply brief and indicates that none of the statements were considered in arriving at the

22  findings contained herein.

23

24

ORDER ON MOTIONS FOR SUMM JMT - 20

1  **Conclusion**

2       For the reasons stated above, the Court

3
        1.     GRANTS summary judgment to Plaintiff RRW on its request for declaratory
4  relief.

5       2.     GRANTS summary judgment to Plaintiff RRW and DISMISSES Defendant's
   counterclaims against it.
6
        3.     GRANTS Plaintiff CIC's motion to strike the hearsay statements submitted by
7  Defendant.

8       4.     GRANTS summary judgment to Plaintiff CIC on its claim of breach of fiduciary
   duty.
9

10

11      The clerk is ordered to provide copies of this order to all counsel.

12      Dated: October 8, 2015.

13

14

15

   Marsha J. Pechman
16 United States District Judge

17

18

19

20

21

22

23

24

ORDER ON MOTIONS FOR SUMM JMT - 21