UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RRW LEGACY MANAGEMENT GROUP, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>CAMPBELL WALKER,<br><br>    Defendant. | CASE NO. C14-326 MJP<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

Having heard testimony and reviewed the evidence presented by the parties, the Court enters the following Findings and Facts and Conclusions of Law:

**BACKGROUND**

1. On October 8, 2015, this Court entered an Order on Motions for Summary Judgment (ECF No. 141) (the "Order"). In the Order, this Court granted summary judgment in favor of RRW Legacy Management Group, Inc. ("RRW") on RRW's request for declaratory relief, and granted summary judgment to Campbell Investment Company ("CIC") on its claim that the defendant Campbell M. Walker ("Mr. Walker") breached

his fiduciary duty to CIC. Defendant Campbell entered into "conflicting interest" transactions that were required to be submitted for approval by "qualified directors" of CIC under RCW 23B.08.700 & 720 (Order at pp. 14-17).

2. The Court conducted the damages trial on October 27 and 28, 2015, and on January 11, 2016. In its case-in-chief, CIC called John W. Curran, Campbell Walker, William Partin and Antoinette Walker as witnesses. Campbell Walker called Patricia Greenwade as a witness in his defense case. The trial concluded on January 11, 2016, after the Court heard closing argument from counsel for both CIC and Defendant Walker.

## FINDINGS OF FACT

**1.** CIC is a closely-held family corporation incorporated in 1929.

**2.** CIC is an active Washington corporation in good standing with the Washington Secretary of State and is duly authorized to maintain this action.

**3.** Defendant was the president and a director of CIC for a 15-year period of time from 1999-2014.

**4.** While he was president, CIC did not hold any board meetings.

**5.** While he was president, CIC did not hold any shareholder meetings, except for one ceremonial meeting in Ireland to celebrate the anniversary of his parents.

**6.** Defendant created false minutes of CIC board meetings and for shareholder meetings that never took place.

**7.** None of CIC's business or management decisions were ever presented to the CIC board for approval.

**8.** Defendant was repeatedly warned by legal counsel for CIC, starting as early as 2004, that his actions in failing to hold shareholder and board meetings were improper, violated Washington corporation laws and CIC's bylaws, and were putting CIC's interests at high risk.

9.  During his tenure, Defendant failed to maintain CIC's books and records in Washington, as required by CIC's by-laws and Washington's corporations law.

10. As president of CIC, Defendant terminated Argyll Limited Partnership ("Argyll")'s prior management relationship with CIC and put a new arrangement in place between CIC and Darshan League, Ltd. ("Darshan"), an off-shore entity that Defendant controlled. TX 20 (Defendant stating in 2009 that Darshan is "my company" in connection with a loan).

11. At Defendant's direction, CIC paid $3,074,224 in fees to Darshan. TX 59. These management fees were all paid while Defendant was also paying himself a salary, bonus, and other benefits for his role in managing CIC. These Darshan payments are identified in Trial Exhibit 165. For at least one of the payments CIC made to Darshan, the company had to draw on a line of credit to make the payment. $43,811 was accrued in interest on the credit line to support the payment. Ex. 172.

12. The CIC board never reviewed or approved the change in management arrangements or the payment of fees to Darshan.

13. Defendant directed CIC to pay consulting fees of at least $200,000 to his father. These expenditures were never approved by the CIC board. These fees are identified in Trial Exhibit 167.

14. Defendant caused CIC to pay for (either directly or through reimbursement to Defendant) "contract services" of at least $54,646 to individuals who worked as household servants in Defendant's and his parents' Dublin manor and for other personal services. These expenditures were never approved by the CIC board. These payments are identified in Trial Exhibit 170. Defendant failed to maintain sufficient records to delineate between expenditures for work performed for CIC (if any) and expenditures for work performed for his personal benefit or the benefit of related people or entities.

15. Defendant also caused CIC to pay for professional services that were, at least in part, for Defendant's personal benefit and that of his company McVay Energy LLC (McVay"), and for his mother and her company, Cougar Energy LLC ("Cougar"). *E.g.*, TX 27

(directing that CIC be billed for and pay for accounting services performed for Defendant and his mother); TX 187 (letter from Defendant's counsel stating that legal and accounting work "was for Mr. Walker in his personal capacity"); TX 216 (showing CIC billed for work done to set up Cougar). While the company was undoubtedly in need of professional services, the expenditures were never approved by the CIC board and total at least $702,660. These expenses are identified in Trial Exhibit 169. Defendant failed to maintain sufficient records to delineate between expenses for work performed for CIC and expenses for services performed for his benefit or the benefit of his mother and her company.

16. Defendant engaged in extensive international travel while president of CIC, which was paid for by CIC. This travel and related expenses were never approved by the CIC board and total at least $324,857. These expenses are identified in Trial Exhibit 171. The business of CIC was gas and oil wells located in the United States. No evidence of work on behalf of CIC requiring these expenses was introduced. The travel was for the personal benefit of Defendant.

17. Defendant also caused CIC to make disbursements to or incur other expenses in connection with oil and gas well investments by CIC, where portions of CIC's investments were comingled with and transferred to McVay (owned by Defendant), Cougar (owned by Defendant's mother and managed by Defendant), and PABO Oil & Gas LLC ("PABO") (owned by Defendant's bookkeeper and personal friend Pat Greenwade). Written contracts only exist for some of these arrangements. The contracts with McVay (owned by Defendant) and Cougar (owned by Defendant's mother) were clearly conflicting interest transactions as defined by statute. The contracts with PABO were not.

18. Defendant's transfers of CIC's interest in oil and gas wells to McVay, Cougar, and PABO was not approved by CIC's board, and Defendant's comingling of CIC's investment interests with respect to McVay, Cougar, and PABO (and the related

FINDINGS OF FACT AND CONCLUSIONS OF LAW- 4

payments between CIC and McVay, Cougar, and PABO) were never approved by the CIC board.

19. Defendant caused CIC to pay $78,428 in life insurance policy premiums on behalf of a life insurance trust where he was the trustee and booked these transactions as loans to Robert Walker's community property (Robert Walker is the Defendant's father). The CIC board never approved the payment of these premiums. These expenses are identified in Trial Exhibit 180.

20. Two categories of payments made by CIC to Defendant do not fall into the "conflicting interest transaction" category. Over fifteen years, $1,576,739 was paid to Defendant as salary, taxes and benefits. A director's fee of $200,000 was also paid. Directors' fees were paid to other members of the board. These fees do not appear to be unusual or excessive for the work of running a company investing in gas and oil and run at a profit. Nor do they appear excessive for the fifteen-year period encompassed by the lawsuit.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and over the subject matter.
2. The burden of proof is by a preponderance of the evidence.
3. The Court has previously found a breach of fiduciary duty on the part of Defendant for "conflicting interest transactions" under RCW 23B.08.700-720.
4. A "transaction" is defined, under the ABA Model Business Corporation Act § 8.60.A, as "a bilateral (or multilateral) arrangement to which the corporation or an entity controlled by the corporation is a party." Each of the categories of payments outlined in the Findings of Fact meets this definition.
5. Damages for a breach of fiduciary duty are limited to those damages that are proximately caused by the fiduciary's conduct. Once a fiduciary's self-dealing or personal benefit is shown, the burden does not shift to the defendant to prove the fairness or legitimacy of all transactions. It does shift for those actions shown to have been for personal benefit.

6. Plaintiffs have met their burden to show losses to CIC for the following categories and amounts of payments:

   a) Darshan/Management payments     $3,074,224
   b) Travel expenses     324,857
   c) Consulting fees to Robert Walker (father)     200,000
   d) Payments on Robert Walker's life insurance policy     78,428
   e) "Contract services"     54,646
   f) Interest accrued on the line of credit     43,811

7. The payments made to McVay, Cougar and PABO for leases represent funds that were diverted from CIC. It is of no consequence that some of these contracts were not profitable. It is the original diversion of CIC funds that could have been used for other investments that is of consequence. However, only the transactions involving two of the companies (McVay and Cougar) represented dealings which fall under the "conflicted interest" statutory provisions. PABO (because it lacks any familial affiliation with Defendant) does not fall under the "conflicting interest transaction" statutory provisions.

8. Precision in the award of damages is not required and the Court therefore awards two-thirds of the originally-claimed amount of $440,161 for a net of $293,147.

9. The same rationale can be applied to the fees paid to professionals in the amount of $702,660. CIC paid bills at Defendant's direction for services rendered to McVay, Cougar and CIC. A corporation engaged in business undoubtedly needs these types of services. The Court therefore concludes that two-thirds of the amount of $702,660 should be awarded, for a net of $467,972.

**REMEDIES**

As for CIC's request that the Court direct an accounting as to the financial records relating to the McVay, Cougar and PABO participation transactions, the Court declines to do so. This remedy was sought for the first time in CIC's pretrial brief; it is not clear why CIC did not

conduct this forensic accounting itself, or why it failed to do any discovery of the bookkeeper or others during the course of this proceeding that might have assisted in the clarification of CIC's confusing or nonexistent recordkeeping. The process seems fraught with potential complications, expense, and the prospect of further litigation and ill will. The simple truth is that this is a family dispute that must end.

Plaintiffs are ordered to prepare a judgment in conformity with the above findings and conclusions and submit the proposed judgment form to the Court within fourteen days of the filing of these findings.

The clerk is ordered to provide copies of this order to all counsel.

Dated this 28th day of January, 2016.

Marsha J. Pechman
United States District Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW- 7